UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| KANE C., : |  |
|    Plaintiff, : |  |
| : |  |
|    v. : | C.A. No. 20-381MSM |
| : |  |
| KILOLO KIJAKAZI, : |  |
| ACTING COMMISSIONER OF : |  |
| SOCIAL SECURITY, : |  |
|    Defendant. : |  |

**REPORT AND RECOMMENDATION**

PATRICIA A. SULLIVAN, United States Magistrate Judge.

In April 2016, at the age of seventeen, Plaintiff Kane C. experienced a cluster of tonic-clonic and dyscognitive seizures[1] resulting in a diagnosis of epilepsy. Prior to developing epilepsy, Plaintiff had struggled in school due to his behavior; he dropped out before completing high school. Several months after he turned eighteen on December 15, 2016, Plaintiff applied for Adult Child Disability Benefits ("CDB")[2] and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"), claiming disability based on epilepsy (tonic-clonic and dyscognitive seizures), attention deficit hyperactivity disorder ("ADHD"), oppositional defiant disorder ("ODD") and memory issues. Now pending before the Court is his motion to reverse

---

[1] In the Listing pertinent to this case, tonic-clonic seizures are "characterized by loss of consciousness accompanied by a tonic phase (sudden muscle tensing causing the person to lose postural control) followed by a clonic phase (rapid cycles of muscle contraction and relaxation, also called convulsions)." 20 C.F.R. Part 404, Subpart P, App. 1, § 11.00H(1)(a). Dyscognitive seizures are "characterized by alteration of consciousness without convulsions or loss of muscle control. During the seizure, blank staring, change of facial expression, and automatisms (such as lip smacking, chewing or swallowing, or repetitive simple actions, such as gestures or verbal utterances) may occur. During its course, a dyscognitive seizure may progress into a generalized tonic-clonic seizure." Id. at § 11.00H(1)(b). Listing 11.02 addresses the impairment of "Epilepsy" and sets out the indicia that, if met or equaled, would result in a finding of disability. Id. at § 11.02.

[2] These are benefits paid to an individual who has attained the age of eighteen and has a disability that began before age twenty-two. 20 C.F.R. § 404.350(a)(5). For such a claim, the alleged onset of disability is deemed to be the day before the eighteenth birthday. In this case, that is December 14, 2016. Tr. 15-16.

the decision of the Acting Commissioner of Social Security ("Commissioner"), which rests on the conclusion that, although he is significantly impaired by epilepsy, anxiety/affective disorders, personality/impulse control disorder and ADHD, he has not been disabled at any relevant time. Plaintiff contends that the administrative law judge ("ALJ") erred in his Step Three finding that epilepsy does not meet or equal the requirements of Listing 11.02 (Epilepsy) and in his reliance in formulating Plaintiff's RFC[3] on the opinions of the non-examining expert physicians and psychologists, particularly at the reconsideration phase,[4] while rejecting as unpersuasive the opinion of Plaintiff's treating nurse practitioner. ECF No. 13-1 at 15-20. The Commissioner's counter motion asks the Court to affirm. ECF No. 16.

The matter has been referred to me for preliminary review, findings and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B).

I.  **Background**

Plaintiff's pre-onset educational records are the earliest evidence in the file. They reveal that he was placed for significant periods at a special school based on behavior and was diagnosed with ADHD, adjustment disorder, ODD and anxiety. Tr. 458, 470, 471, 483. Although his intellectual capacity was found to be in the average range, Plaintiff's attendance and grades were poor. E.g., Tr. 465, 484, 520-23. He dropped out in the twelfth grade. Tr. 775. Plaintiff's educational records were not submitted in connection with his disability application until October 2018, after his claims had been denied at the reconsideration phase.

---

[3] RFC refers to "residual functional capacity," which is "the most you can still do despite your limitations," taking into account "[y]our impairment(s), and any related symptoms, such as pain, [that] may cause physical and mental limitations that affect what you can do in a work setting." 20 C.F.R. § 404.1545(a)(1).

[4] Because the ALJ found the reconsideration phase non-examining sources (Dr. Keith Bauer and Dr. Philip Matar) to be most persuasive, this report and recommendation is focused on their findings.

Plaintiff's first serious seizures (both tonic-clonic and dyscognitive) were recorded at Newport Hospital in April 2016; providers recommended that he avoid marijuana and alcohol and prescribed anticonvulsant medication. Tr. 610, 619. Psychiatric examination during this hospitalization yielded normal findings. Tr. 618. In June and again in October 2016, Plaintiff was hospitalized for seizures although in both instances he was given Narcan, and medical notes suggest serious drug abuse and non-compliance with seizure medication. Tr. 630-32, 644-47. At the end of 2016, during treatment at Boston Neurobehavioral Associates, Plaintiff expressed resistance to medication and his preference for cannabinoids, although he was noted to be cooperative and to have normal mood and affect. Tr. 653.

In early 2017, Plaintiff went to Florida where his mother had gone sometime prior. Tr. 766, 801. In March and again in September 2017, hospital notes indicate status epilepticus, attributed to Plaintiff's missing and/or reducing seizure medication. Tr. 655-57, 713-14. During 2017, providers counseled Plaintiff about marijuana cessation and noted "no evidence of aphasia," normal attention and concentration and cooperativeness. E.g., Tr. 656-57, 715. In October through the end of 2017, Plaintiff attended several medical appointments with his mother. Tr. 748, 754, 791. During these appointments, Plaintiff continued to report seizure activity; these records are replete with clinical observations focused on Plaintiff's brain and neurological functioning. During these appointments the first adult references to mental health issues appear. These records reflect that depression, memory loss and ADHD were reported, although one provider noted that Plaintiff "[d]enies current anxiety or depression, Mom feels otherwise." Tr. 749, 756, 791, 793. At the end of 2017, based on a referral by his neurologist, Plaintiff saw a psychiatrist, Dr. Richard Wu, for mental health treatment. Tr. 805-808; see e.g., Tr. 815, 837, 883. The initial psychiatric evaluation resulted in diagnoses of bipolar I disorder,

3

moderate depression and social anxiety; Dr. Wu noted Plaintiff's cooperative attitude.  Tr. 806-07.  For treatment, Dr. Wu conservatively recommended that Plaintiff "participate in activities and therapies as tolerated," with brief supportive therapy and medication.  Tr. 808.

In the fall of 2017, Plaintiff applied for disability benefits in Florida.  Tr. 323-372.  Some of the supporting materials (for example, a seizure questionnaire and several function reports) appear to have been completed by his mother.  Tr. 373, 376, 394, 416.  According to these forms, Plaintiff was experiencing significant memory loss and would not go outside because of his fear of a seizure.  Tr. 376, 394, 419.  By contrast, in the spring of 2018, Plaintiff told a Florida provider that he "will go hang out with his friends approximately 3-4 nights a week."  Tr. 858.

In connection with his application, accompanied by his mother, Plaintiff was examined by a consulting psychologist, Dr. Billie Jo Hatton, in Florida.  Tr. 775.  The clinical interview resulted in a detailed description of Plaintiff's educational struggles, including his childhood diagnoses.  Tr. 775-76.  On mental status examination, Dr. Hatton observed Plaintiff to be cooperative with good speech articulation, no evidence of depression or anxiety and "strength in social skills," but below average academic functioning, and mild to moderate memory and attention issues.  Tr. 777.  She noted bipolar disorder, ADHD and rule out borderline intellectual functioning and found Plaintiff's prognosis to be "somewhat guarded."  Tr. 777, 778.

The records from Rhode Island and Florida that had been assembled as of early 2018 (which include Dr. Hatton's summary of the educational records, but not the educational records themselves) were reviewed initially and on reconsideration by four Florida-based state agency experts: two physicians and two psychologists.  At the reconsideration phase, notes reflect Plaintiff's allegations of memory loss, the recent referral by his neurologist for psychiatric care, the resulting psychiatric evaluation, Dr. Hatton's report and Plaintiff's ongoing issues (including

many hospitalizations) with epilepsy. Tr. 142-44. Psychologist Dr. Keith Bauer made a detailed review of Plaintiff's mental health and seizure disorder history; he found moderate limitations in all spheres, but opined that Plaintiff retains the RFC to perform simple routine tasks with limited social interaction. Tr. 144, 149-51. The non-examining physician, Dr. Philip Matar, performed an equally detailed review of the clinical records, focusing on the many CTs, MRIs, EEGs and neurological observations related to epilepsy; noting the evidence of non-compliance with treatment, including reports of alcohol and cannabinoids despite advice against their use, and normal findings on clinical examination, he endorsed the diagnosis of severe epilepsy but found that Plaintiff could work at the medium exertional level with additional limitations to avoid the dangers of climbing, heights and operating dangerous machinery. Tr. 147-49. Both Dr. Bauer and Dr. Matar opined that Plaintiff's epilepsy symptoms do not meet or equal Listing 11.02.[5] Tr. 149, 181. Plaintiff's applications were denied on reconsideration on January 18, 2018.

After reconsideration was denied, Plaintiff's claim seemed to languish in Florida possibly because of confusion regarding his representation. E.g., Tr. 243, 286. An ALJ hearing ultimately was set for June 2019, but before it was held, an attorney advised that "[t]he aforementioned claimant has recently relocated to an area outside the scope of the current ODAR office." Tr. 282, 289. Soon after, Plaintiff was scheduled for an ALJ hearing in Rhode Island on November 26, 2019. Tr. 291.

---

[5] The Listing 11.02 criteria focus on the number and severity of seizures in a specified period despite full compliance by the claimant with prescribed treatment, as well as on mental functioning in some circumstances. For example, the Listing is met or equaled by tonic-clonic seizures occurring at least once a month for at least 3 consecutive months despite adherence to prescribed treatment or dyscognitive seizures occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment. Listing § 11.02A, B; see Listing § 11.00H(4)(d) ("We do not count seizures that occur during a period when you are not adhering to prescribed treatment without good reason.").

5

During the period from just prior to the denial of reconsideration until the ALJ hearing in November 2019, Plaintiff continued medical treatment, first in Florida and then back in Rhode Island.

In Florida, seizure treatment in 2018 with the primary care provider reflects that Plaintiff "has been compliant with his medications lately," resulting in seizures that were less frequent ("last seizure was a few weeks ago," "[o]nly 1 tonic clonic seizure in the past three months"). E.g., Tr. 815, 821; see Tr. 818 ("Generalized tonic-clonic seizure-Stable at this time"). Primary care mental health notes reflect depression in early 2018, but at subsequent appointments, Plaintiff is described as stable with appropriate mood and affect despite not taking medications prescribed to treat depression. E.g., Tr. 816, 818, 821. In March 2018, his treating neurologist, Dr. Peter Huzar, noted seizure-like episodes and increased medication, but regarding mental health, wrote, "at this moment I am not sure why he is on antipsychotic." Tr. 850, 852. In May, Dr. Huzar noted that, "[a]t right now the seizure is excellent control"; regarding mental health, he observed, Plaintiff "does not have any major anxiety is no any major depression symptoms recently." Tr. 862, 864. Plaintiff continued to struggle with epilepsy; for example, in August 2018, he was hospitalized for a seizure cluster following a medication change. Tr. 866-71. Meanwhile, during 2018, Plaintiff received mental health treatment from Dr. Wu, who noted that "[t]reatment is expected to improve [the] health status and functioning of patient." Tr. 884. Consistent with this prediction, by appointments in March and May 2018, Plaintiff's mental status examination yielded normal results and treatment with Dr. Wu ended. Tr. 887. The last Florida treating record is from October 2018, when Plaintiff was treated for temporal lobe seizure activity detected by EEG monitoring after a medication change. Tr. 877-79.

6

Following a gap during which the record reflects no treatment, Plaintiff's treatment for epilepsy resumed in Rhode Island. In May 2019 and again in August 2019, he was briefly hospitalized for seizure clusters, both grand mal and partial. Tr. 896, 940, 954. During this period, Plaintiff was living at a homeless shelter. E.g., Tr. 897, 941. In August 2019, Plaintiff established a treating relationship with a neurologist. Tr. 948. The final records for treatment of seizure activity are dated August 14-15, 2019; hospital notes reflect "alcohol intoxication" and a possible link to a recent medication increase. Tr. 942, 944. On psychiatric examination, Plaintiff's mood, affect, behavior, thoughts and judgment were all assessed as normal. Tr. 944. After that episode, there is no more treatment for active seizures. At the ALJ hearing held in November 2019, Plaintiff testified that he had been seizure free for three months. Tr. 50.

Plaintiff also began Rhode Island-based mental health treatment in May 2019, when he initiated care at the Providence Center; in July he began to see a therapist (Brian DiCicco, L.M.H.C.) and, in August, to treat with a nurse practitioner (Scott Robinson, N.P.) to prescribe medication. Tr. 996, 997, 1014. The Providence Center's initial assessment recommends treatment for depressed mood and ruminating thoughts, but also noted Plaintiff's cooperative attitude, intact memory and the ability to attend. Tr. 1001. In the therapy notes that follow, spanning the period from July 2019 until October 2019, the therapist, Mr. DiCicco, made normal observations (e.g., good mood, full affect, good eye contact, pleasant attitude, average intellectual functioning, intact memory, the able to attend, and stable appearance). Tr. 1007, 1010, 1036. The treating notes of Nurse Robinson are mixed; while he consistently recorded that Plaintiff appeared stable and cooperative, with average intellectual functioning and intact memory, his observations sometimes include sad, depressed and/or anxious mood and affect, guarded attitude and distractibility, with decreased energy and appetite. Tr. 1017, 1033, 1042.

However, at one of his four appointments with Plaintiff (on September 11, 2019), Nurse Robinson made entirely normal observations, noting good mood and affect, normal energy and appetite, able to attend and pleasant attitude. Tr. 1027.

On November 12, 2019, Nurse Robinson signed the only treating source opinion of record. Tr. 1044-46. In it, he opined to moderately severe impairments in the ability to relate to others, the ability to understand and remember, and the ability to respond to work pressure and co-workers or perform varied tasks. Tr. 1044-45. He found a severe impairment in the ability to respond to supervision. Tr. 1045. He estimated that Plaintiff would be absent from work more than three times per month. Tr. 1046.

## II. Standard of Review

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla – that is, the evidence must do more than merely create a suspicion of the existence of a fact and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam); Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981); Brown v. Apfel, 71 F. Supp. 2d 28, 30 (D.R.I. 1999), aff'd, 230 F.3d 1347 (1st Cir. 2000) (per curiam). Once the Court concludes that the decision is supported by substantial evidence, the Commissioner must be affirmed, even if the Court would have reached a contrary result as finder of fact. Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987) (per curiam); see also Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991); Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128-31 (1st Cir. 1981). The determination of substantiality is based upon an evaluation of the record as a whole. Brown, 71 F. Supp. 2d at 30; see also Frustaglia v. Sec'y

of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987). Thus, the Court's role in reviewing the Commissioner's decision is limited. Brown, 71 F. Supp. 2d at 30. The Court does not reinterpret the evidence or otherwise substitute its own judgment for that of the Commissioner. Id. at 30-31 (citing Colon v. Sec'y of Health & Human Servs., 877 F.2d 148, 153 (1st Cir. 1989)). "[T]he resolution of conflicts in the evidence is for the Commissioner, not the courts." Id. at 31.

If the Court finds either that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim, the Court may remand a case to the Commissioner for a rehearing under Sentence Four of 42 U.S.C. § 405(g). Allen v. Colvin, C.A. No. 13-781L, 2015 WL 906000, at *8 (D.R.I. Mar. 3, 2015) (citing Jackson v. Chater, 99 F.3d 1086, 1097-98 (11th Cir.1996)).

### III.   Disability Determination

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 416(I); 20 C.F.R. § 404.1505.[6] The impairment must be severe, making the claimant unable to do previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-1511.

#### A.   The Five-Step Evaluation

The ALJ must follow five steps in evaluating a claim of disability. See 20 C.F.R. § 404.1520. First, if a claimant is working at a substantial gainful activity, the claimant is not

---

[6] The Social Security Administration has promulgated identical sets of regulations that are applicable to this case. See McDonald v. Sec'y of Health & Human Servs., 795 F.2d 1118, 1120 n.1 (1st Cir. 1986). For simplicity, I cite only to one set of these regulations.

9

disabled. 20 C.F.R. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments that significantly limit physical or mental ability to do basic work activities, then the claimant does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Appendix 1, the claimant is disabled. 20 C.F.R. § 404.1520(d). Fourth, if a claimant's impairments do not prevent doing past relevant work, the claimant is not disabled. 20 C.F.R. § 404.1520(e)-(f). Fifth, if a claimant's impairments (considering RFC, age, education and past work) prevent doing other work that exists in the local or national economy, a finding of disabled is warranted. 20 C.F.R. § 404.1520(g). Significantly, the claimant bears the burden of proof at Steps One through Four, but the Commissioner bears the burden at Step Five. Sacilowski v Saul, 959 F.3d 431, 434 (1st Cir. 2020); Wells v. Barnhart, 267 F. Supp. 2d 138, 144 (D. Mass. 2003) (five step process applies to both DIB and SSI claims).

   **B.   Opinion Evidence**

An ALJ must consider the persuasiveness of all medical opinions in a claimant's case record. See 20 C.F.R. § 404.1520c. The most important factors to be considered when the Commissioner evaluates persuasiveness are supportability and consistency; these are usually the only factors the ALJ is required to articulate. 20 C.F.R. § 404.1520c(b)(2); Jones v. Berryhill, 392 F. Supp. 3d 381, 839 (M.D. Tenn. 2019); Gorham v. Saul, Case No. 18-cv-853-SM, 2019 WL 3562689, at *5 (D.N.H. Aug. 6, 2019). Supportability "includes an assessment of the supporting objective medical evidence and other medical evidence, and how consistent the medical opinion or . . . medical finding[] is with other evidence in the claim." Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 5859 (Jan. 18, 2017). Other factors that are weighed in light of all of the evidence in the record include the medical source's

relationship with the claimant and specialization, as well as "other factors" that tend to support or contradict the medical opinion or finding.  See 20 C.F.R. § 404.1520c(c)(1)-(5); Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. at 5859.  In other words, "[a] medical opinion without supporting evidence, or one that is inconsistent with evidence from other sources, [is] not . . . persuasive regardless of who made the medical opinion."  Id.

IV.   Analysis

   A.   ALJ's Step Three Determination

Plaintiff argues that the ALJ's Step Three finding that Plaintiff's epilepsy did not meet Listing 11.02 is based on a lay interpretation inconsistent with the objective record.  ECF No. 13-1 at 17.  There are at least two fatal flaws in this argument.[7]

First, the ALJ's Step Three finding is not the result solely of his lay interpretation of conflicting and complex medical records; to the contrary, the ALJ had the benefit of Dr. Bauer's administrative finding that Plaintiff suffered from epilepsy, but that Plaintiff "has a severe but not listing level mental impairment," as well as Dr. Matar's administrative finding that "while [epilepsy] is present, it does not meet listing level."  Tr. 145, 149.  Further, Dr. Matar noted "extensive evidence of non-compliance" with prescribed treatment, while Dr. Bauer noted that Plaintiff "has been noncompliant with meds due to limited finances," which findings are pertinent to the Listing 11.02 analysis.  Tr. 144, 149; see 20 C.F.R. Part 404, Subpart P, App. 1 § 11.02A.  As discussed *infra*, the ALJ made the well-supported findings that the state agency opinions are persuasive, as well as that the "more recent treatment notes are not persuasive in

---

[7] A third problem with Plaintiff's Step Three argument is that it amounts to little more than the unadorned assertion that "the objective record outlined herein supports a fulfillment of this listing," ECF No. 13-1 at 17, without explaining how and without citing to what evidence in the record supports this conclusion.  Such arguments – those the Court is left to sort out on its own – "are deemed waived."  Melissa G. v. Kijakazi, C.A. No. 20-cv-367-WES, 2021 WL 3124228, at *8 (D.R.I. July 23, 2021).

11

establishing functional limitations more restrictive."[8]  Tr. 22, 24.  There is no contrary opinion from any source; that is, no qualified medical professional has opined that Listing 11.02 is met or equaled.  See Byron v. Saul, Case No. 18-cv-684-PB, 2019 WL 3817401, at * 4-5 (D.N.H. Aug. 14, 2019) (with no medical opinion that Listing is met, no error in ALJ's relying on state agency physician's finding that Listing was not met).

Second, Plaintiff is wrong in arguing that the ALJ's Step Three finding is inconsistent with the objective record.  To the contrary, the decision reflects that the ALJ carefully considered the objective record in light of Plaintiff's counsel's argument that Listing 11.02 was met or equaled; further, he asked the attorney to make a post-hearing filing directing him to the references in the objective record supportive of the claim.  Tr. 43-44, 71-72.  In response, a post-hearing letter was provided; it lists seizure activity with citations to the record.  Tr. 607-09.  The problem is that the letter's content simply does not approach what is necessary to meet or equal Listing 11.02, in that it does not point to any instance of "tonic-clonic seizures . . . occurring at least once a month for at least 3 consecutive months," which the letter identifies as the pertinent criterion.  20 C.F.R. Part 404, Subpart P, App. 1, § 11.02A.  Notably, Plaintiff has not relied on this letter to support his argument before the Court.

Mindful that Plaintiff bears the burden to show that he has an impairment or a combination of impairments that meets or equals a listing, Torres v. Sec'y of Health & Human Servs., 870 F.2d 742, 745 (1st Cir. 1989), I find that there is no error in the ALJ's conclusion that

---

[8] Plaintiff also asks the Court to reject the findings of the non-examining physicians in reliance on Rose v. Shalala, 34 F.3d 13 (1st Cir. 1994).  Rose is not applicable to the facts of this case.  Rose addresses a circumstance where the existence of an impairment whose diagnostic criteria are subjective (chronic fatigue) was wrongly rejected by non-examining sources solely because of the lack of objective findings.  Id. at 18.  In this case, the impairment – epilepsy – was not rejected, but was accepted, indeed never questioned, and found to be severe by the non-examining physicians and by the ALJ.  Further, there were ample objective findings (EEGs, MRIs, CTs, neurological examinations), which the non-examining physicians considered and on which the ALJ relied.

the evidence does not reasonably support the finding that Plaintiff's epilepsy medically meets or equals Listing 11.02. The ALJ's Step Three finding regarding Listing 11.02 should be affirmed.

**B.     ALJ's RFC Determination**

Plaintiff has launched a two-pronged attack on the ALJ's RFC determination, challenging his treatment of the administrative findings made by the non-examining experts on one hand and of Nurse Robinson's opinion on the other.

1. Reliance on Non-Examining Experts

Focusing on the almost two-year gap between the January 2018 non-examining opinions of Dr. Bauer and Dr. Matar and the November 2019 ALJ hearing, Plaintiff argues that the ALJ erred in relying on their findings because they opined based on a "largely incomplete medical record."[9] ECF No. 13-1 at 16. To support this argument, Plaintiff points to two categories of material that the non-examining experts did not see: (1) Plaintiff's pre-onset educational records; and (2) Plaintiff's mental health records – the four appointments in Florida in 2018 with psychiatrist Dr. Richard Wu and the appointments in Rhode Island from May until November 2019 at the Providence Center. Id. at 18.

It is well-settled that remand is required when "the state-agency physicians were not privy to parts of [plaintiff's] medical record [which] detracts from the weight that can be afforded their opinions." Ruben M. v. Saul, C.A. No. 19-119MSM, 2020 WL 39037, at *9 (D.R.I. Jan. 3, 2020), adopted, 2020 WL 555186 (D.R.I. Feb. 4, 2020); see Sandra C. v. Saul, C.A. No. 18-375JJM, 2019 WL 4127363, at *6 (D.R.I. Aug. 30, 2019) ("Remand is necessary to

---

[9] Plaintiff also rests his argument on his interpretation of two cases from the Fourth Circuit, Millner v. Schweiker, 725 F.2d 243, 245 (4th Cir. 1984), and Leonard v. Schweiker, 724 F.2d 1076, 1078 (4th Cir. 1983), which he contends stand for the proposition that the administrative findings "of a non-examining, non-treating physician is not substantial evidence when it is contradicted by other evidence in the record." ECF No. 13-1 at 18. Neither Millner nor Leonard support Plaintiff's argument; to the contrary they hold that a "report of a non-examining, non-treating physician should be discounted and is not substantial evidence when contradicted by all other evidence in the record." Millner, 725 F.2d at 245 (emphasis added); see Leonard, 724 F.2d at 1078. This argument is disregarded.

allow for an error-free evaluation of the complete record."). An ALJ cannot rely on a file review opinion if post-review developments reflect a significant worsening of the claimant's condition because such an opinion does not amount to substantial evidence. Ruben M., 2020 WL 39037, at *9; see Ledoux v. Acting Comm'r, Soc. Sec. Admin., Civil No. 17-cv-707-JD, 2018 WL 2932732, at *4 (D.N.H. June 12, 2018)). On the other hand, the law is also clear that an ALJ can review post-file review records without the assistance of a medical expert to determine whether they reflect worsening or symptoms more serious than those in the records seen by the non-examining experts. Michele S. v. Saul, C.A. No. 19-65WES, 2019 WL 6242655, at *8-9 (D.R.I. Nov. 22, 2019). That is, the ALJ may rely on his own common-sense observation that the post-review records are similar to or more benign than the pre-review records. Sanford v. Astrue, No. CA 07-183 M, 2009 WL 866845, at *8-9 (D.R.I. Mar. 30, 2009). To render an SSA opinion irrelevant merely because the expert was not privy to updated medical records "would defy logic and be a formula for paralysis." Id. at *8.

When these principles are applied to this case, it is clear that there is no error in the ALJ's reliance on the administrative findings of Dr. Bauer and Dr. Matar. Although the two-year time gap between their findings and the ALJ's hearing is unusually long, that is a red herring – what matters is the symptoms reflected in the post-file review record. In this instance, the ALJ's finding that these records "are not persuasive in establishing functional limitations more restrictive than adopted herein," is amply supported by evidence, such as the periods when Plaintiff was in compliance with treatment and was able to achieve "excellent control," Tr. 864, of seizures, including the seizure-free months from August 2019 through the ALJ hearing, as well as by the relatively benign (except for occasional depression, anxiety and ruminating

14

thoughts) post-file review mental status examinations and relatively conservative mental health treatment.  Tr. 22-23.

The specific records to which Plaintiff points do not undermine this conclusion. Considering first the post-file review mental health treating record, the Court's analysis begins with the reality that this is not a case where the non-examining expert psychologist, Dr. Bauer, lacked access to a well-developed record; to the contrary, Dr. Bauer's review included consideration of Dr. Hatton's report, with its detailed description of Plaintiff's childhood difficulties, the recent referral for psychiatric treatment, the resulting psychiatric evaluation, as well as the many psychiatric assessments made during treatment for seizure activity.  Based on this evidence, Dr. Bauer found serious mental health impairments, including severe depressive/bipolar disorder, anxiety, personality and impulse control and ADHD.  Tr. 143.  What Dr. Bauer did not see is Dr. Wu's follow up assessment that, after only two treating appointments, Plaintiff's mental status evaluations became entirely normal and treatment ended, Tr. 887, 889, and the Providence Center's treating notes, which reflect the consistent findings that Plaintiff needed treatment for depression and anxiety, but was stable and cooperative, with one treating provider (the therapist, Mr. DiCicco) making normal mental status examination observations, while his colleague (Nurse Robinson) noted sadness, depression, irritability, anxiety and distractibility at some (but not all) of his appointments with Plaintiff.  These relatively benign treating records simply do not reflect a mental health condition that is materially worse than what Dr. Bauer assessed or that detracts from the weight that can be afforded to Dr. Bauer's findings.  See Ruben M., 2020 WL 39037, at *9.

The second category of records on which Plaintiff relies are the educational materials. While these relate to the period from 2011 through 2015, they were not submitted in support of

his applications until October 2018; therefore, Dr. Bauer did not see them. The problem with this argument is that the content of these records was summarized in accurate detail by Dr. Hatton based on her clinical interview of Plaintiff and his mother; this portion of her consulting report was specifically referenced by Dr. Bauer, whose "additional explanation" endorses the diagnoses (such as ODD) that are reflected in the educational records. Tr. 144. Thus, like the mental health records, the educational records do not supply evidence of a condition that is materially more limiting than what Dr. Bauer found.

Based on the foregoing, I find that the non-examining experts' findings constitute substantial evidence and that the ALJ did not err in relying on them, despite the nearly two-year delay from when they made their findings until the ALJ's hearing. See Jennifer F v. Saul, C.A. No. 19-547MSM, 2020 WL 6488706, at *6-7 (D.R.I. Sept. 16, 2020), adopted, 2020 WL 6487813 (D.R.I. Nov. 4, 2020) (no error in reliance on non-examining findings based on ALJ's common-sense observation that mental health issues and MSE findings in post-file review treating record mirror same issues and findings in record on which SA psychologists relied to form their opinions); Vanessa C. v. Kijakazi, C.A. No. 20-363MSM, 2021 WL 3930347, at *5-6 (D.R.I. Sept. 2, 2021), adopted by Text Order, (D.R.I. Nov. 2, 2021) (no error in reliance on state-agency opinions despite post-file review treatment in light of ALJ's common-sense observation that pre- and post-review records were similar).

### 2. Reliance on Nurse Robinson

The ALJ's reasons for finding Nurse Robinson's opinion to be unpersuasive are amply supported by substantial evidence. For his first reason, the ALJ correctly noted the clash between Nurse Robinson's opinion that Plaintiff is moderately severely impaired in his ability to understand and remember and Nurse Robinson's treating observation of Plaintiff's average

intellectual functioning, intact memory, linear and organized thoughts, and adequate judgment and insight. Tr. 24. Similarly, the ALJ correctly noted the clash between Nurse Robinson's opinion that Plaintiff is moderately severely impaired in his ability to relate to other people and Nurse Robinson's treating observation of Plaintiff's cooperative and pleasant attitude. For his second reason, the ALJ accurately noted the inconsistency between the many normal mental status examinations and Nurse Robinson's opinions; the Court notes that this includes Mr. DiCicco's contemporaneous normal clinical findings. Id. And, for his third reason, the ALJ correctly noted the evidence from Plaintiff himself regarding his daily activities (for example, his statement that, "[a]t night he will go hang out with his friends approximately 3-4 nights a week"), Tr. 25, which is inconsistent with the severe and moderately severe findings made by Nurse Robinson with respect to his ability to get along with others.

I find that the ALJ has presented reasons that are appropriately supported by the evidence and discern no error in the determination that Nurse Robinson's opinion is not persuasive. See Melissa G., 2021 WL 3124228, at *6 (ALJ may favor non-treating sources over treating providers "so long as her conclusions are adequately supported by the record."). In such circumstances, the law is clear – the Court cannot second-guess sufficiently supported conclusions. The ALJ's decision should be affirmed.

**V.    Conclusion**

Based on the foregoing analysis, and having reviewed the entire record, I find that the ALJ's decision is consistent with applicable law and grounded in substantial evidence. I therefore recommend that Plaintiff's Motion to Reverse the Decision of the Commissioner (ECF No. 13) be DENIED and that the Acting Commissioner's Motion for an Order Affirming his Decision (ECF No. 16) be GRANTED. Any objection to this report and recommendation must

be specific and must be served and filed with the Clerk of the Court within fourteen (14) days of its receipt.  See Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district judge and the right to appeal the Court's decision.  See United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).

/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
January 19, 2022